**FILED**

2014 Mar-17  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| WANDA L. YOUNG, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.  2:12-CV-1631-SLB** |
| | ) | |
| SUNGARD   FINANCIAL   SYSTEMS, | ) | |
| L.L.C., | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>[1]

This case is currently before the Court on Defendant SunGard Business System, Inc.'s

(denominated in the Complaint as SunGard Financial Systems, LLC; hereinafter referred to

as "SunGard" or "Defendant") Motion for Summary Judgment (Doc. 17).[2] In her Complaint,

---

[1]At the conclusion of oral argument, the court informed the parties of its intention to grant summary judgment in favor of defendant. The court requested that counsel for defendant prepare a proposed memorandum opinion for the court and required that counsel send a copy of the proposed opinion to counsel for plaintiff. Although the court has made some changes to the opinion prepared by defendant's counsel, it has adopted a large part of the proposed opinion. The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997). This is an important opinion and the court had reached a firm decision as to the appropriate outcome before requesting a proposed opinion from defendant's counsel. In this case, however, the defendant drafted the opinion according to the express instructions of the court as to its contents. These instructions were stated to defendant's counsel, with plaintiff's counsel present, following oral argument. Although largely taken from the opinion proposed by defendant's counsel, the court personally reviewed this opinion and the opinion reflects the court's own conclusions.

[2] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

Plaintiff, Wanda Young (hereinafter "Plaintiff" or "Young") asserts the following claims against SunGard: (1) disability discrimination under the Americans with Disabilities Act ("ADA"); (2) hostile work environment under the ADA; (3) retaliation under the ADA; (4) retaliatory discharge under Alabama Code §25-5-11.1; (5) discrimination under the Age Discrimination in Employment Act ("ADEA"); (6) hostile work environment under the ADEA; (7) interference with rights under the Family and Medical Leave Act ("FMLA"); and (8) retaliation under the FMLA.

Upon consideration of the record, the submissions of the parties, the arguments of counsel, and relevant law, the court is of the opinion that SunGard's Motion for Summary Judgment is due to be granted with respect to all claims.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

3

## II. <u>STATEMENT OF FACTS</u>[3]

### A. SUNGARD'S SERVICE BUREAU

SunGard operates a Service Bureau in Birmingham, Alabama. (Doc. 19-1 ¶ 3.)  Data entry employees, who work for the Service Bureau, process documents and information for the Thrift Savings Plan of the Federal Retirement Thrift Investment Board ["FRTIB"].  (*Id*. ¶ 4.)  Information processed by the SunGard employees is highly confidential and includes personal identifying information and financial information of the plan participants.  (*Id.*)

The data entry employees work in a "clean room" to ensure that confidential information cannot be taken from the room.  (*Id*. ¶ 5.)  Service Bureau employees are required to execute a document acknowledging the FRTIB Service Bureau Clean Room Requirements. (*Id.*)  Those requirements include multiple restrictions on the use of computer systems and employees are told specifically, "<u>There is absolutely no personal use of FRTIB systems and applications allowed</u>."  (*Id.*; doc. 19-2, exh. 3, at 86 [emphasis in original]; *id.*, exh. 4, at 88 [emphasis in original].)  Employees are prohibited from bringing cell phones and other wireless devices, computing devices and cameras into the clean room. (Doc. 19-1 ¶ 5; doc. 19-2, exh. 3, at 86-87.)  SunGard has policies that limit employees' use of its

---

[3]As required when evaluating a Motion for Summary Judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to Young, the non-moving party.  *See E.G., Alan v. Tyson Foods, Inc.*, 121 F. 3d 642, 646 (11th Cir. 1997)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

computer systems and email and that prohibit, among other things, the display or transmission of sexually explicit material.  (Doc. 19-1 ¶ 6; doc. 19-2, exh. 6, at 91, 92-93.)

## B.  YOUNG'S EMPLOYMENT AND DISCIPLINARY HISTORY

Young was hired by SunGard as a Data Entry Associate on August 22, 2007.  (Doc. 19-2 at 97.)  She remained in that position throughout her employment working in the service bureau processing information for the FRTIB contract.  (*Id*. at 99.)  For the period relevant to this case, Young's Supervisor was Leonard Crear, age 42, and Crear's supervisor, the Manager of the FRTIB Service Bureau, was Mitchel "Mitt" Ware, age 37.  (Doc. 19-1 ¶ 8; doc. 19-3 at 7.)  The local Human Resources Representative was Debi Sisson, age 57, and Joyce LaMere, age 57, was the Vice President of Human Resources for the division.  (Doc. 19-1 ¶ 8; doc. 19-3 at 7.)

During her employment, Young received a copy of SunGard's Global Business Conduct and Compliance Program, which included SunGard's anti-discrimination policies and its polices regarding use of company internet, email, and other communication resources.  (Doc. 19-2 at 114, 117; doc. 19-2, exh. 7, at 114-119, 138-143.)  Young acknowledged receipt of a copy of the Global Business Conduct and Compliance Program on August 24, 2007.  (Doc. 19-2, exh. 5, at 90.)  On two separate occasions, Young executed confirmations of the FRTIB Clean Room Requirements.  (*Id*., exh. 3, at 87; *id.*, exh. 4, at 89.)

On February 8, 2010, Young received a warning notice for unsatisfactory work performance for completing only 65% of her monthly performance quota.  (*Id*., exh. 18, at

5

159.)  Two months later, on April 26, 2010, she received a verbal warning for sleeping on the job.  (*Id*., exh. 20, at 164.)  Young acknowledges sleeping on one occasion while working at her desk and on other occasions while on a break.  (Doc. 19-2 at 187-89.)  She testified that a young, male employee named Tony slept on the job "every day all day" during his employment but he was not disciplined.  (*Id*. at 191-93.)  Tony was eventually terminated by Sungard for sleeping on the job.  (*Id*. at 192-93; doc. 19-4 ¶ 12.)

On February 16, 2011, Young received a Final Written Warning for violating SunGard's Clean Room Requirements by bringing her purse and her cell phone into the clean room.  (Doc. 19-2 at 200-01; doc. 19-2, exh. 22, at 173.)  She testified that she had brought her purse and cell phone in the clean room and that she knew such conduct was a violation of SunGard's Clean Room Requirements.  (Doc. 19-2 at 201, 205-06.)  She contends that some employees were allowed to violate the Clean Room Requirements without discipline; however, she acknowledges that other employees received written warnings for violation of the Clean Room Requirements.  (*Id*. at 204, 207.)  Ware testified that at least two employees were terminated for violation of the Clean Room Requirements – April Smith and Nicholas Sawyer.  (Doc. 19-4 ¶ 12.)

The record also contains warning notices Young received for punctuality and attendance.  (Doc. 19-2, exh. 19, at 160-63; *id*., exh. 21, at 165-72.)  Young testified that these warning notices correctly reflected the times she was tardy and/or absent.  (Doc. 19-2 at 183-85, 199-200.)  On August 3, 2011, Young received a written warning regarding an

unexcused absence and excessive tardiness.  (Doc. 19-2, exh. 23, at 174.)  She does not

dispute that she was in fact tardy on the days for which she received discipline.  (Doc. 19-2

at 208.)  However, she argues that younger, non-disabled employees were not similarly

disciplined for tardiness or unexcused absences, but this assertion is not supported by the

record.  Ware testified that a number of employees – who were under 40 and without a

known disability – received similar disciplinary notices for tardiness.  (Doc. 19-4 ¶ 12.)

## C.  YOUNG'S ALLEGATIONS OF DISABILITY AND HARASSMENT

Young contends that she "suffers from a number of disabling physical conditions,

including anxiety, depression, sleep apnea, high blood pressure, and plantar fasciitis.  (Doc.

19-1 ¶ 9.)  She testified that she also has back pain.  (Doc. 19-2 at 38-39.)  She testified that

her back pain limits her ability to stand for long period.  (*Id*. at 43.)  She has been given work

restrictions due to her back pain, but she does not currently have any work restrictions.  (*Id*.

at 46-47.)  She also testified that the pain from her plantar fasciitis hampered her ability to

concentrate and impaired her ability to walk.  (*Id.* at 48.) Young testified that she is not

currently being treated for depression, although she has been prescribed medications for

depression in the past.  (Doc. 19-2 at 50.) She does not see a doctor for medical treatment on

a regular basis.  (*Id*. at 38.)

Young testified that, during her employment, she was subjected to harassment due to

her disabilities.  (*Id*. at 282-86.)  The alleged harassment included her co-employees being

mean to her, ignoring her, not inviting her to join them for after-hours activities, leaving her

off mass emails, making her sit in the back of the room, being hard on her, and tattling on her. (*Id*. at 53-55, 65-66, 283-86.) According to Young, she was "bullied in silence." (*Id*. at 70.) She also testified that her co-workers called her "gay" and questioned her sexual orientation. (*Id*. at 55-56, 64-65.) She also testified that she overheard a Supervisor tell another employee to stop talking to her. (*Id*. at 72-73.)

Young contends that Debi Sisson, the Human Reasources Manager, harassed her based on her disability by telling Young "if I had a disability, I would just stay home." (*Id*. at 238-39, 240; doc. 19-5 ¶¶ 2, 7.) Sisson testified that she made this comment in response to a statement Young made "in which she indicated to [Sisson] that she was at work even though she was not well." (Doc. 19-5 ¶ 7.) Sisson testified she made the statement to Young about staying home "in conjunction with an explanation to Young that she did not have to come to work on days when she was suffering from an FMLA-approved medical condition." (*Id.*)

Young also testified that she was harassed by Lisa Peterson because of her age. (Doc. 19-2 at 289.) She described this alleged harassment as follows: "[Peterson] would be the one that – I mean, I remember her coming down, you know, to tell people, like you know, everything that she would—it was like whatever I did, then it would come out, well, y'all can't do that no more. She just has her way. She tiptoes around there." (*Id.*) She testified that Peterson, a Team Leader, and "management" harassed her "because of maybe the certain

things that maybe some people do at their age, maybe key slower or sleep on their breaks." (*Id.* at 288-89.)

SunGard's Sexual and Other Discriminatory Harassment Policy states that employees who believe that they have been subjected to discriminatory harassment (including age and/or disability-based harassment) are "require[d] . . . to promptly notify [their] Supervisor, [their] Human Resources representative or the Chief Compliance Officer." (Doc. 19-2, exh. 7, at 142.)   Young complained to Ware about the treatment she was receiving from other employees on one occasion; she told Ware that, "People, they don't like me." (Doc. 19-2 at 160.) She added that she never told Ware, "Hey, they are discriminating against me." (*Id.*) At no time during her employment did Young make a complaint to any member of SunGard management of discrimination or harassment based on disability or age or any other protected characteristic. (Doc. 19-2 at 113, 290.)

## D.  YOUNG'S WORKERS' COMPENSATION CLAIM AND FMLA REQUESTS

On December 23, 2010, Young reported to SunGard that she had suffered an on-the-job injury to her finger by falling down the stairs at work. (Doc. 19-2 at 276-77.)  She received medical treatment and benefits through workers' compensation. (*Id.* at 278-79.)

Young requested and was granted FMLA leave repeatedly during her employment with SunGard.  Aetna administers FMLA leave requests for SunGard's Service Bureau employees.  (*Id.* at 219-20.)   When an employee requests leave, Aetna processes the paperwork and reviews the medical documentation to approve or disapprove the leave

request.  (*Id.* at 220-21.)  Aetna's records reflect that Young was approved for medical leave 29 times and denied leave twice during her employment.  (Doc. 19-2, exh. 26, at 179-80.) She testified that her leave was approved every time that she provided proper documentation to Aetna.  (Doc. 19-2 at 224.)

In May 2011, SunGard held a meeting to educate all employees about the FMLA and address potential FMLA abuse.  (*Id*. at 214-16.)  Young contends that, after the meeting, her supervisors called her aside to talk to her about her use of FMLA.  (*Id*. at 217-19.)  She testified that she was told that her FMLA leave was "not adding up," but she conceded that she was allowed or approved for all requested FMLA leave.  (*Id*.)

## E.  EVENTS LEADING TO YOUNG'S TERMINATION

On September 9, 2011, Young sent an email to a number of other employees in the Service Bureau inviting them to have some of the candy she was keeping at her desk.  (*Id*. at 133; doc. 19-2, exh. 11, at 152.)  In this email, Young wrote:

> Hey Everybody.  I have candy @ My Desk for Everyone who would like a piece. . . .
>
> Oh . .  I almost forgot!  Everybody except Rhonda Nicholson.  She is BAD! On top of that;  She is wanted by the Police.  And Yes she is ARMED!  "she stay strapped"  I'M NOT JOKING.

(Doc. 19-2, exh. 11, at 152 [capitalization in original].)  She sent a copy of the email to Ware, Sisson, and Crear.  (*Id.*)

After receiving the email, Young's supervisor, Leonard Crear met with Young and gave her a verbal reprimand for her inappropriate use of email and making harmful

statements about a fellow employee.  (Doc. 19-6 ¶ 4.)  Young told Crear that, despite her statement that she was "not joking," she was joking about Nicholson and she told him that she would send a follow-up email to that effect.  (*Id.*)  Crear testified that he specifically instructed Young not to send any other email regarding the matter, although Young disputes this testimony.[4]  (*Id.*; doc. 19-2 at 139-40.)  Later that evening, Young sent another email to the same group of employees stating that she was only joking about Nicholson.  (Doc. 19-2, exh. 12, at 153.)  This email, which was also copied to Ware, Sisson, and Crear, stated:

> Hey Everybody!  I still have Candy @ My Desk for Everyone.  But I need to make Something Clear . .  Rhonda Nicholson is NOT an "OUT LAW" as I said in the first email.  She is not wanted by the Police.  She isn't Armed, and neither does she 'stay strapped'.  She IS!! Bad Though. . .
>
> I was told by Management that my statement was a bit ON EDGE.  I felt bad and wanted to clarify.  I also Let Mgt. Know That I would send this email, once I got home.
>
> I was telling Rhonda – that as I was typing the first Email – I was cracking up as I pictured Her Coming to My Desk (matter of factly) and taking the entire Bowl "Of Candy" to combat my statement.  LOL!  She got a HUGE Laugh Out Of It All!!  I was Happy Because It was All In Humor!  The Sole Purpose of Joking "To Rhonda" In the email is because she is fun and funny IMHO and I knew she would Crack Up!  But never the less I am Sorry for Joking[.]

(*Id.* [capitalization in original])

After learning of the second email, Crear informed Ware and LaMere that he had specifically instructed Young not to send the second email.  (Doc. 19-6 ¶ 5 and exh. A.)

---

[4]Young testified that Crear told her she could send a second email from "home to work."  (Doc. 19-2 at 139.)

11

Nicholson was questioned by LaMere as part of the decisionmaking process for disciplining Young for improper use of company email. (Doc. 19-1 ¶ 10.) Nicholson told LaMere that she had been very offended by Young's email messages. (*Id.*)

Also, as part of the investigation, SunGard reviewed its computer system to determine the level of Young's personal use of the system. (*Id.* ¶ 11.) Upon review, LaMere discovered that Young had used Sunguard's computer system to send and receive a large volume of personal communication, including a number of inappropriate jokes with co-workers and outside individuals. (*Id.*) SunGard also discovered that, on September 9, 2011, the same date that she had sent the Nicholson email, Young had set up her telephone and personal computer to forward her personal text messages and emails to her work email account. (*Id.* ¶ 12.) On September 14, 2011, Young sent messages to a number of her family members and encouraged them to correspond with her at work through her work email account. (Doc. 19-2 at 149-53; doc. 19-2, exh. 13, at 154; *id.*, exh. 14, at 155, *id.*, exh. 15, at 156.) This communication with outside individuals was problematic for SunGard in two respects: (1) by sending and receiving text messages through her work email, Young was by-passing the Clean Room Requirement prohibiting the use of personal communication devices; and (2) many of the texts that she ultimately exchanged were sexually explicit and entirely inappropriate for the workplace. (Doc. 19-1 ¶ 12; doc. 19-4 ¶ 8; doc. 19-2, exh. 8, at 149; *id.*, exh. 9, at 150; *id.*, exh. 10, at 151.)

Ware decided to terminate Young and LaMere reviewed and approved his decision.

(Doc. 19-4 ¶ 9; doc. 19-1 ¶ 13.)  Ware testified:

> Young was terminated because:  (a) she sent an e-mail to co-employees and supervisors making alarming and hurtful comments about another employee being armed and wanted by the police; (b) after being specifically warned by her supervisor not to send another e-mail on the subject, she insubordinately did so anyway; (c) upon review of its computer systems, [Sungard] discovered that Young had engaged in a large volume of personal e-mail use on the company's e-mail system; (d) while her conduct was under review, Young forwarded her personal text messages to come through her work e-mail; (e) those text messages, which by-passed the company's clean room requirements, included graphic sexual messages . . . ; and (f) Young had a prior history of discipline for performance issues, attendance and violation of policy.

(Doc. 19-4 ¶ 10.)

The termination decision was communicated to Young during a meeting on September 15, 2011, with Ware and Crear; Sisson and LaMere attended by phone.  (Doc. 19-2 at 147-49.)  LaMere informed Young she was being terminated because of her inappropriate use of email.  (*Id*. at 148)  On September 15, 2011, Young was forty-five years old.  (*See* doc. 1-1 at 2.)  There was no mention of age, disability or family medical leave during the call.  (Doc. 19-2 at 149.)

Young contends that a number of her female co-workers viewed an email depicting male strippers.  (Doc. 22-2 ¶¶ 3-4.)  Ware and LaMere deny knowing about the stripper email.  (Doc. 19-1 ¶ 15; doc. 19-4 ¶ 14.)   Also, Young contends that Jenna Lambert, a co-employee, sent an email with pictures of obese women at Wal-Mart wearing bikinis and other revealing clothing. (Doc. 19-2 at 312, 316-17.)  Ware testified he was aware of the Wal-Mart

email and he believes that he verbally warned Lambert about sending the email.  (Doc. 19-4 ¶ 14.)  LaMere denies knowing about the Wal-Mart email.  (Doc. 19-1 ¶ 15.)  Young contends that Nicholson would simulate fights with another co-worker, (doc. 19-2 at 311), and that an unidentified data entry associate allegedly walked around the office and pretended to be on a battle ship ready to "take people down," (*id*. at 171-73).

SunGard did not employ anyone to specifically replace Young.  (*See* doc. 19-3 at 8.) On September 26, 2011, the staffing company, Aerotek, filled three requisitions for open positions for data entry operators, including Young's former position.  (*Id.*)  The positions were filled with Aerotek employees.  (*Id.*)  According to its Interrogatory responses, "Defendant does not know the age of the Aerotek employees or whether they suffered from any disability." (*Id.*)

## III. <u>DISCUSSION</u>

### A.  PLAINTIFF'S DISABILITY STATUS

To succeed on any claim under the ADA, Young must first demonstrate that she is an individual with a disability as defined by 42 U.S.C. 12102(1).  *See Rossbach v. City of Miami*, 371 F.3d 1354, 1356-57 (11th Cir. 2004).  "The ADA defines 'disability' to include: '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment.'" *Id*.; *see also* 42 U.S.C. § 12102(1).  "Major life activities" are activities such as "caring for oneself, performing manual tasks, seeing, hearing, eating,

sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* (2)(A). Plaintiff has offered very little evidence to establish that she is an individual with a disability as defined by the ADA. However for purposes of deciding whether defendant's Motion for Summary Judgment is due to be granted, the court has assumed Young has a disability.

## B. DISCRIMINATION WITH REGARD TO DISCIPLINE

SunGard contends that Young's discriminatory discipline claims are due to be dismissed as untimely and/or based on a lack of evidence of discrimination.

### 1. Timeliness of Claims

In promulgating the ADA, Congress adopted the charge-filing procedures set forth in Title VII.  42 U.S.C. § 12117(a)(citing 42 U.S.C. § 2000e-5).  These procedures require, *inter alia,* that an employee file a Charge with the EEOC within 180 days of the date of the discrimination, and, after the EEOC issues a right-to-sue letter, the employee must file suit in the district court within 90 days.  42 U.S.C. § 2000e-5(e)-(f).  The ADEA also requires a claimant to file a Charge with the EEOC charge "within 180 days after the alleged unlawful practice occurred."  29 U.S.C.A. § 626(d)(1)(A).

Young filed her EEOC Charge on December 27, 2011.  (Doc. 1-1 at 1.)  Thus, any discrete act of discrimination for which she makes a claim must have occurred on or after June 30, 2011.  Young asserts claims for discriminatory discipline based upon a written warning for performance on February 8, 2010, a verbal warning for sleeping on the job on

April 26, 2010, and a final written warning for violation of clean room requirements on February 16, 2011. She argues that these claims are timely because the discipline constituted part of a continuing violation. (Doc. 21 at 24-25.) The court disagrees. The court finds that the alleged discriminatory disciplinary actions were discrete acts that are time-barred. *Stovall v. Hancock Bank of Alabama, Inc.*, No. 2:12-CV-1036-MEF, 2013 WL 3357851, *7 (M.D. Ala. July 3, 2013)(citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955 (11th Cir. 2008); *Tarmas v. Secretary of the Navy*, 433 Fed. App'x 754, 760 (11th Cir. 2011)).

Therefore, defendant's Motion for Summary Judgment will be granted as to plaintiff's discriminatory discipline claims based on these incidents.

### 2. Prima facie case and pretext

The only timely claim for discriminatory discipline asserted by Young is the claim based upon the written warning she received on August 3, 2011 for tardiness and unexcused absence.

In this Circuit, the familiar burden-shifting analysis of *McDonnell Douglas*[5] applies to ADEA and ADA claims based on circumstantial evidence. *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1332-33 (11th Cir. 2013)(ADEA); *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (ADA).

———————————

[5]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases. First, the plaintiff must establish a prima facie case of discrimination. . . . The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .
>
> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000)(internal citations and quotations omitted).

"To establish a prima facie case of disparate treatment, [Young] must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly-situated . . . employees [outside the protected class] more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)(citations omitted); *see also East v. Clayton County*, 436 Fed. Appx. 904,

911 (11th Cir. 2011)(ADEA)(citing *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997);[6] *Collado v. United Parcel Service*, 419 F.3d 1143, 1149 (11th Cir. 2005)(ADA).[7]  "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia* 171 F.3d at 1368 (citations omitted).   "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."   *Id*. (citations omitted).   "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent [the court] from

---

[6]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it.  ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

[7]The prima facie case under the ADA is stated somewhat differently:  "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability."  *Holly v. Clairson Industries*, 492 F.3d 1247, 1255-56 (11th Cir. 2007). "An employer unlawfully discriminates against a qualified individual with a disability by taking adverse action against him because of the disability, or by failing to provide 'reasonable accommodations' for the disability, unless doing so would impose an undue hardship on the employer." *Howard v. Steris Corp.* 886 F. Supp. 2d 1279, 1291 (M.D. Ala. 2012)(citing 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a)).  In the case of allegations of ***failure to accommodate*** an individual with a disability, the plaintiff need not identify a comparator to establish a prima facie case.  *Holly*, 492 F.3d at 1261-62.  However, "[t]o establish ***unlawful disparate treatment***, a plaintiff generally must demonstrate that his employer treated similarly situated employees outside of his protected class more favorably than he was treated."  *Wolfe v. Postmaster General*, 488 Fed. Appx. 465, 468 (11th Cir. 2012)(citing *Burke–Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006))(emphasis added).

18

second-guessing [an] employer['s] reasonable decisions and confusing apples with oranges." *Id*. (citations omitted).

Young does not dispute that she was in fact tardy and/or absent as set forth in the written warning.  She testified that she believed other employees were tardy or absent but were not written up.  However, nothing in the record supports her belief.  To the contrary, the record contains evidence that other employees, including younger employees and/or employees with no known disabilities such as Venora Redrick, were disciplined for tardiness and attendance.  The court finds that plaintiff has not established that other employees outside her protected classes were treated more favorably with regard to discipline.

Nevertheless, even if the court assumes a prima facie case of discriminatory discipline, SunGard has presented a legitimate, non-discriminatory reason for issuing the discipline, which Young has not rebutted.

> A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006)(quotation omitted).  Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it . . . .  Quarreling with that reason is not sufficient."  *Wilson* [*v. B/E Aerospace, Inc.*], 376 F.3d [1079,] 1088 [(11th Cir. 2004)]; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008)("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for [the adverse employment action] was pretextual.").  The ultimate burden of persuasion remains with the plaintiff.  *See E.E.O. C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).  Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant

employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000)(*en banc*).

*Pears v. Mobile County*, 645 F. Supp. 2d 1062, 1089-90 (S.D. Ala. 2009).

SunGard asserted that Young was written up for being late for work repeatedly and was absent without an excuse; Young has not rebutted these reasons for her discipline. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1354 (11th Cir. 1999). In order to meet her burden, Young must "meet the reason head on and rebut it." *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1012, 1037 (11th Cir. 2000). In this case, rather than rebut the reason for her discipline, Young admits that for her written warning was for the reasons stated and that those reasons are accurate, and she has not presented evidence that she was given the written warning because of her age or disability. Therefore, the court finds that plaintiff has not shown that defendant's articulated reason for the written warning is unworthy of credence and/or that the real reason for the discipline was discriminatory animus based on her age or disability.

Defendant's Motion for Summary Judgment as to plaintiff's discriminatory discipline claims based on the written warning of August 3, 2011, will be granted and such claims will be dismissed.

**C.  DISCRIMINATION WITH REGARD TO TERMINATION**.

###### 1.  Age Discrimination

Young testified in her deposition that she did not believe that her termination was motivated by her age.  (Doc. 19-2 at 233.)  During oral argument at the hearing on this matter, Young's counsel conceded that she was not pursuing a termination claim based on age discrimination.  Therefore, defendant's Motion for Summary Judgment will be granted on this claim.

###### 2.  Disability Discrimination

"To establish unlawful disparate treatment, a plaintiff generally must demonstrate that his employer treated similarly situated employees outside of his protected class more favorably than he was treated." *Wolfe*, 488 Fed. Appx. at 468.  Young can state a *prima facie* case if she can present evidence that an employee outside her protected class, who was similarly situated to her in all relevant respects, was treated more favorably with regard to nearly identical conduct.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004); *Maniccia*, 171 F.3d at 1368.

The undisputed evidence demonstrates that Young was terminated for violation of SunGard's policies.  Specifically, SunGard terminated plaintiff because she sent a mass email falsely stating that another employee was armed and dangerous; forwarded her personal text messages to her work email account; encouraged her friends and relatives to communicate with her through her work email account; and sent and received a large number of personal

21

emails on her work email during work time, including some that were sexually graphic.  At the time of her termination, Young had a history of discipline for poor performance, poor attendance, and policy violations.  Those responsible for the decision to terminate Young, Ware and LaMere testified that no other employee engaged in the same or nearly-identical misconduct.  Young has not presented evidence to dispute this testimony.

Young argues that other employees sent or viewed inappropriate emails.  However, she has not shown that the decisionmakers were aware of all the inappropriate emails or that these employees had taken steps to forward personal texts and emails to their work email account.  Because the court finds that the incidents of inappropriate emails upon which plaintiff relies are not "nearly identical" to the conduct for which plaintiff was terminated, the court finds plaintiff has not established a *prima facie* case of discriminatory termination based on her disability.  Because Young cannot state a *prima facie* case, summary judgment is required.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

However, even if the court assumes a *prima facie* case of disability discrimination, SunGard would be entitled to summary judgment because Young has not demonstrated that SunGard's articulated reasons for her termination are unworthy of credence and/or the real reason for her termination was disability discrimination.  Young has the burden of persuading the court that the proffered reason for the employment decision is a pretext for an unlawful action.  *See Reeves*, 530 U.S. at 142-43; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 514 (1993). "[P]laintiff must demonstrate 'such weaknesses implausibilities, inconsistencies,

incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence.'" *Watkins v. Sverdrup Technology, Inc.*, 153 F. 3d 1308, 1314 (11th Cir. 1998)(quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  A proffered reason is shown to be pretext for discrimination only when it is shown that the reason was false and that discrimination was the real reason.  *Brooks*, 446 F.3d at 1163.

Young has produced no evidence to cast doubt on SunGard's articulated reasons for her termination.  In fact, she has admitted all of the inappropriate conduct that led to her termination:  She admitted sending the emails about Nicholson, she admitted forwarding her personal text messages to her email, and she admitted to engaging in the sexually graphic exchange emails on her work computer during work hours.  Her belief or speculation that SunGard terminated her because of her disability does not create an inference of discrimination or satisfy her burden to respond to defendant's properly supported motion for summary judgment.  *See Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073-74 (11th Cir. 1995).

Defendant's Motion for Summary Judgment as to plaintiff's disability claim based on her termination will be granted and such claim will be dismissed.

**D.  HOSTILE WORK ENVIRONMENT**

To state a claim for disability or age-based harassment, an employee must meet the same standard utilized for a hostile work environment under Title VII.  *See EEOC v. Massey*

*Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1249 (11th Cir. 1997)(age); *Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1219-20 (N.D. Ala. 2002)(disability).  In a hostile work environment case, "the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered."  *Vance v. Ball State University*, 133 S. Ct. 2434, 2441 (2013)(citations omitted).   A plaintiff establishing a violation of the ADA and/or the ADEA based on harassment when she can show "the workplace is permeated with . . . discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012)(citations omitted); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

> An employer is therefore liable to an employee for a [discriminatory] hostile work environment under . . . if the employee proves that:
>
>> (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.

*Id.* (quoting *Edwards*, 602 F.3d at 1300).  "The fourth element – that the conduct complained of was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment – is the element that tests the mettle of most [hostile environment] harassment claims."  *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

"While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action under Title VII."   *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

Young must demonstrate that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 21 (1993)(internal citations omitted).   The Eleventh Circuit has held:

> It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010)(en banc).   Therefore, only conduct that is "based on" a protected category, such as race, may be considered in a hostile work environment analysis. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).   "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." *Id*. at 583; *see also Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301-02 (11th Cir. 2007)("Title VII does not prohibit profanity alone, however profane.   It does not prohibit harassment alone, however severe and pervasive.   Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category . . . .").   This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998).

*Jones*, 683 F.3d at 1297 (11th Cir. 2012); *see also Laosebikan v. Coca-Cola Co.*, 167 Fed. Appx. 758, 765 (11th Cir. 2006).

Young's claim of a hostile work environment under the ADEA warrants little discussion. Young was forty-one years old when SunGard hired her and forty-five years old when it terminated her. She has presented no evidence of any age-based comments or epithets during her employment. Moreover, the record contains no evidence of severe and pervasive intimidation, ridicule, or insult based on her age sufficient to alter her work environment. Therefore, summary judgment is appropriate on the ADEA hostile-work environment claim.

As to her disability harassment claim, Young alleges that her coworkers and her supervisors ignored her and, when she was not ignored, her coworkers and supervisors were mean to her. These actions and inactions, to the extent the record supports Young's allegations, were not based on her alleged disabilities and, therefore, cannot form the basis of a hostile work environment claim. *See Stedman*, 219 F. Supp. 2d at 1223 (citing *Gupta*, 212 F.3d at 583-84). For instance, Young testified that she was called gay by her co-workers; being gay is not a disability. Being called gay is not a reference to any of the claimed conditions supporting plaintiff's assertion that she is disabled. Therefore, the court has not considered Young's report of being called "gay" as supporting her claim of disability harassment.

Also, Young contends that Sisson made the statement to her that "if I had a disability, I would just stay home." To the extent this statement is indicative of disability bias,[8] a reasonable person would not find this statement intimidating, ridiculing, or humiliating in context. *See Oncale*, 523 U.S. at 81. The remarks of which Young complains were isolated and not overt. The court finds that a reasonable person in plaintiff's position would not feel that his or her work environment had been altered by harassing conduct based on his or her disability.

Therefore, defendant's Motion for Summary Judgment as to plaintiff's hostile work environment claim based on disability harassment is due to be granted and such claim dismissed.

## E.  RETALIATION UNDER THE ADA

Pursuant to the ADA, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "This provision creates a prohibition on retaliation under the ADA that is similar to Title VII's prohibition on retaliation. Accordingly, [the court] assess[es] ADA retaliation claims under the same framework [it] employ[s] for retaliation claims arising under Title VII." *Stewart v. Happy*

_____

[8]Sisson testified that she made this statement in response to Young's statement to her that she was at work despite not feeling well.

27

*Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (citation omitted). In order to prove an ADA retaliation claim, a plaintiff must show that: (1)[she] engaged in conduct protected by the ADA; (2)[she] was subjected to an adverse employment action at the time, or after the protected conduct took place; and (3) the defendant took an adverse employment action against [her] because of [her] protected conduct." *Collado v. United Parcel Service*, 419 F.3d 1143, 1158 (11th Cir. 2005) (internal quotations and citation omitted). Young alleges that she was terminated in retaliation for protected activity taken under the ADA; however, the court finds that Young did not engage in any protected activity at any time during her employment.

"To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011). Young's EEOC Charge was filed after her termination; therefore, it cannot be casaully related to any adverse action taken by SunGard. She made multiple FMLA requests during her employment, but she did not request an accommodation or complain about disability discrimination during her employment. In fact, Young's only internal complaint about mistreatment was a statement she made to Ware that her coworkers did not like her. However, this statement is not protected activity because she did not tell Ware her coworkers did not like her because of her disability or that SunGard was violating the ADA. *See*

28

*Rhodes v. Tuscaloosa County Bd. of Educ.*, 935 F. Supp. 2d 1226, 1254 (N.D. Ala. 2013)(citing *Brown v. City of Opelika*, 211 Fed. Appx. 862, 864 (11th Cir. 2006); *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003)).

Therefore, the court finds that defendant's Motion for Summary Judgment as to plaintiff's ADA retaliation claim is due to be granted and such claim is due to be dismissed.

## F.  RETALIATORY DISCHARGE UNDER ALA. CODE § 25-5-11.1

In her Complaint, Young alleges a claim for retaliatory discharge based on her workers' compensation claim in violation of Alabama Code § 25-5-11.1.  Under that section, an employer may not discharge an employee "solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits." Ala. Code § 25-5-11.1; *see also Alabama Power Co. v. Aldridge*, 854 So. 2d 554 (Ala. 2002). During the hearing for this Motion for Summary Judgment, Young's counsel conceded that summary judgment was due to be granted on the claim.  Therefore, summary judgment will be granted on the claim of retaliatory discharge under Alabama Code § 25-5-11.1.[9]

## G.  FAMILY AND MEDICAL LEAVE ACT

Generally, an employee may raise one of two basic types of FMLA claims: one based on the employer's denial of or interference with the employee's substantive rights under the

---

[9]Even if not conceded, summary judgment on plaintiff's retaliatory discharge claim is appropriate.  Young testified in her deposition that she did not believe that she was terminated because she filed a workers' compensation claim and she admitted she had no evidence to support a claim that she was terminated because she filed a workers' compensation claim.  (Doc. 19-2 at 279).

FMLA and the other based on the employer's discrimination or retaliation against the

employee for engaging in activity under the FMLA. The Eleventh Circuit has held:

> Among the substantive rights granted by the FMLA to eligible employees are
> the right to "12 workweeks of leave during any 12–month period ... [b]ecause
> of a serious health condition that makes the employee unable to perform the
> functions of the position of such employee," 29 U.S.C. § 2612(a)(1), and the
> right following leave "to be restored by the employer to the position of
> employment held by the employee when the leave commenced" or to an
> equivalent position, 29 U.S.C. § 2614(a)(1). To preserve the availability of
> these rights, and to enforce them, the FMLA creates two types of claims:
> interference claims, in which an employee asserts that his employer denied or
> otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C.
> § 2615(a)(1), and retaliation claims, in which an employee asserts that his
> employer discriminated against him because he engaged in activity protected
> by the Act, see 29 U. S .C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c) ("An
> employer is prohibited from discriminating against employees ... who have
> used FMLA leave.").

*Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001).

"To state a claim of interference with a substantive right, an employee need only

demonstrate by a preponderance of the evidence that he was entitled to the benefit denied."

*Id.* at 1206–07 (citing *O'Connor*, 200 F.3d at 1353–54; *King v. Preferred Technical Group*,

166 F.3d 887, 891 (7th Cir. 1999)). "In contrast, to succeed on a retaliation claim, an

employee must demonstrate that his employer intentionally discriminated against him in the

form of an adverse employment action for having exercised an FMLA right." *Id.* at 1207

(citing *King*, 166 F.3d at 891).  Young asserts both interference and retaliation under the

FMLA.

### 1.  Interference

There is no basis for Plaintiff's claim for interference with FMLA rights because there is no evidence that SunGard denied or otherwise interfered with Young's substantive rights under the Act.  Young applied for and received FMLA leave 29 times during her four-years of employment with SunGard.  Although defendant denied two requests, Young testified her requested leave was denied when she failed to submit the proper documents to Aetna.  Nothing in the record shows that SunGard ever improperly denied her requests for FMLA leave or otherwise prevented her from taking leave.  Based upon the undisputed facts, the court finds SunGard is entitled to judgment as a matter of law on Young's claim of FMLA interference.

### 2.  Retaliation

Young claims that SunGard terminated her employment in retaliation for her use of FMLA leave.  A plaintiff may attempt to establish retaliation through the use of direct or circumstantial evidence. *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Schoenfeld v. Babbit*, 168 F.3d 1257, 1266 (11th Cir. 1999)(acknowledging the availability of either direct or circumstantial evidence).  When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, courts apply the familiar burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for evaluating Title VII discrimination claims. *Strickland*, 239 F.3d at 1207; see *Dollar v. Shoney's, Inc.*,

981 F. Supp. 1417, 1419 (N.D. Ala. 1997). Under that framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation. *Dollar*, 981 F. Supp. at 1420 (citing *Morgan v. Hilt,* 108 F.3d 1319, 1325 (10th Cir. 1997)); *see Combs*, 106 F.3d at1527–28. To state a prima facie case for retaliation, "an employee must allege that: (1) [she] engaged in a statutorily protected activity; (2) [she] suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Strickland*, 239 F .3d at 1207 (citing *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000)).  If a prima facie case of retaliation has been established, thereby giving rise to a presumption of unlawful, disparate treatment, the burden of production shifts to the defendant to rebut the presumption of retaliation by articulating legitimate, nondiscriminatory reasons for the contested employment action. *Combs*, 106 F.3d at 1528 (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254).  The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it retaliated against the plaintiff. *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254–55 (citation and footnote omitted)). "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 257).  If the defendant successfully articulates legitimate, nondiscriminatory reasons for the contested employment action, the burden shifts back to the plaintiff to show that defendant's stated reasons are merely pretext

for unlawful, discriminatory motives. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256).

The court finds that Young has not demonstrated a *prima facie* case of FMLA retaliation because she has not presented sufficient evidence of a causal connection between her termination and her requests for FMLA leave.  Moreover, even if the court assumed a connection between her termination and her FMLA leave, the court finds that Young has not submitted evidence that SunGard's articulated reasons for her termination are pretext for unlawful retaliation.

Therefore, the court finds SunGard's Motion for Summary Judgment is due to be granted as to plaintiff's FMLA retaliation claim and such claim will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and that defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 17th day of March, 2014.

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE

33